UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JEAN D. BECKER,                              )
                                             )
          Plaintiff,                         )
                                             )
     vs.                                     )   Case No. 2:13CV00095 ACL
                                             )
CAROLYN W. COLVIN,                           )
Acting Commissioner of Social Security,      )
                                             )
          Defendant.                         )

## **MEMORANDUM**

Plaintiff Jean D. Becker brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.

An Administrative Law Judge (ALJ) found that Becker had multiple severe impairments, including several physical impairments, as well as mental impairments and a history of cocaine abuse. Notwithstanding Becker's severe physical and mental impairments, the ALJ found that Becker was not disabled as she had the residual functional capacity to perform the requirements of occupations such as housekeeper, small product assembler, and electronics assembly, which exist in significant number in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary. Because substantial evidence supports the ALJ's opinion, the Commissioner's decision denying benefits is AFFIRMED.

## I. Procedural History

On October 22, 2010, Becker filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), claiming that she became unable to work due to her disabling condition on May 8, 2004. (Tr. 146-59.) Becker's claims were denied initially. (Tr. 78-85.) Following an administrative hearing, Becker's claims were denied in a written opinion by an ALJ, dated September 5, 2012. (Tr. 13-32.) Becker then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on September 23, 2013. (Tr. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Becker claims that the "ALJ erred by failing to provide controlling weight to the treating physician, Dr. Curry, as required by SSR 96-2p" (Doc. 14 at 7) and that the "ALJ did not provide a proper RFC determination as

required by SSR 96-8p because the ALJ failed to explain how the evidence supported his conclusions," *id*. at 13.

## II.  Applicable Law

### II.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks

and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977

(8th Cir. 2003).

## II.B.  Determination of Disability

To be eligible for DIB and SSI under the Social Security Act, plaintiff must

prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d at 1217; *Baker v.*

*Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).   The

Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A).   An individual will be declared disabled "only if

h[er] physical or mental impairment or impairments are of such severity that [s]he is

not only unable to do h[er] previous work but cannot, considering h[er] age,

education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy."   42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B).

The SSA Commissioner has established a five-step process for determining

whether a person is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v.*

*Yuckert*, 482 U.S. 137, 141-42 (1987); *Fines v. Apfel*, 149 F.3d 893, 894-95

(8th Cir. 1998).   First, it is determined whether the claimant is currently engaged in "substantial gainful employment."   If the claimant is, disability benefits must be denied.   *See* 20 C.F.R. §§ 404.1520, 416.920 (b).   Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.   *See* 20 C.F.R §§ 404.1520 (c), 416.920 (c).   To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."   *Id.*   Age, education and work experience of a claimant are not considered in making the "severity" determination. *See id*.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.   *See* 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1.   If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.   *See* 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   If it does not, however, the evaluation proceeds to the next step which requires an inquiry regarding whether the impairment prevents the claimant from performing his or her past work.   *See* 20 C.F.R. § 404.1520 (e), 416.920 (e).   If the claimant is able to perform the previous

work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. *See id.* If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. *See* 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. *See id.* Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. *See Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the

degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity (RFC) assessment. *See* 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## II.C.  Residual Functional Capacity (RFC)

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id.* This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d

798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

Limitations resulting from symptoms such as pain are also factored into the

assessment. 20 C.F.R. § 404.1545(a)(3). The Eighth Circuit has held that a

"claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245

F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning the

claimant's RFC must be supported by medical evidence that addresses the

claimant's ability to function in the workplace. *Lewis v. Barnhart*, 353 F.3d 642,

646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a

claimant's limitations and to determine how those limitations affect his RFC." *Id.*

## II.D.  Opinion Evidence

In evaluating opinion evidence, the Regulations require the ALJ to explain in

the decision the weight given to any opinions from treating sources, non-treating

sources, and non-examining sources. *See* 20 C.F.R. §§ 404.1527(e)(2)(ii),

416.927(e)(2)(ii). The Regulations require that more weight be given to the

opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2). A treating physician's assessment of the nature and severity of a

claimant's impairments should be given controlling weight if the opinion is well

supported by medically acceptable clinical and laboratory diagnostic techniques and

is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2); *see also Forehand v. Barnhart*, 364 F.3d 984, 986

(8th Cir. 2004). This is so because a treating physician has the best opportunity to

observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able
> to provide a detailed, longitudinal picture of [a claimant's] medical
> impairment(s) and may bring a unique perspective to the medical
> evidence that cannot be obtained from the objective medical findings
> alone or from reports of individual examinations, such as consultative
> examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, a medical source's opinion

that an applicant is unable to work involves an issue reserved for the Commissioner

and is not the type of opinion which the Commissioner must credit. *Ellis v.*

*Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord the

opinion, including the length of the treatment relationship and the frequency of

examination, the nature and extent of the treatment relationship, whether the treating

physician provides support for his findings, whether other evidence in the record is

consistent with the treating physician's findings, and the treating physician's area of

specialty. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The Regulations further

provide that the Commissioner "will always give good reasons in [the] notice of

determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

## II.E.  Credibility Findings

An ALJ is required to consider all the evidence relating to a claimant's subjective complaints, including: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant.   *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000).   The ALJ does not need to discuss each factor as long as he or she acknowledges and considers the factors before discrediting the claimant's subjective complaints. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).   "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints."   *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).   This Court must defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence.   *Guilliams*, 393 F.3d at 801.

### III.   The ALJ's Determination

The ALJ found that Becker meets the insured status requirements of the Social Security Act through March 31, 2012.   (Tr. 18.)   He also found that she has not engaged in substantial gainful activity since May 8, 2004, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).[1]   *Id*.

In addition the ALJ concluded that Becker had several severe impairments, including: posttraumatic degenerative joint and disc disease in the lumbar spine with mild spondylolisthesis, right rotator cuff strain, status post left foot/ankle surgery, obesity, posttraumatic stress disorder, bipolar disorder, personality disorder, and history of cocaine abuse (20 CFR 404.1520(c) and 416.920(c)), however, she did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).   (Tr. 18-19.)

As to Becker's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the

---

1   The ALJ made this finding while at the same time noting that Becker was employed at Walgreens as a photography technician in 2006 and performing SGA.   (Tr. 3.)   The record also indicates that Becker's employment at Walgreens resulted in her earning more than the monthly SGA amount from 2004 through the end of 2005 and likely through part of 2006.   (Tr. 188.)

claimant can frequently balance and stoop.   She can occasionally
kneel, crawl, and climb ramps and stairs.   She can never crouch or
climb ladders, ropes, or scaffolds.   In addition, the claimant is limited
to no more than occasional overhead reaching with her non-dominant
right upper extremity.   The claimant can have only occasional inter-
action with coworkers, supervisors, and the public.   She can understand,
remember, and carry out simple instructions.

(Tr. 20.)

In formulating Becker's RFC, the ALJ considered the opinions of doctors

who evaluated the degree of limitation posed by Becker's mental impairments.   The

ALJ conducted a thorough review (Tr. 26-28) of Becker's treating psychiatrist's (Dr.

Denise Curry of Pathways) treatment notes for the eleven times she met with Becker

(540-70), as well as the Medical Source Statement that Dr. Curry completed (Tr.

573-74) regarding the impact of Becker's mental condition on her ability to work.

The ALJ gave Dr. Curry's conclusion that Becker had *marked to extreme limitations*

in all four categories described on the Medical Source Statement (*i.e.*,

Understanding and Memory; Sustained Concentration and Persistence, Social

Interactions, and Adapt[ability]) little weight, because the degree of limitation

assessed by Dr. Curry:

> is not consistent with [ Becker]'s treatment records indicating
> improvement and not consistent with [Becker]'s wide range of active-
> ities of daily living including being the primary caregiver for her
> 3-year old child, providing some in-home care for a man named
> Paul Williams, and going to school online.   Moreover, other records

indicate [ Becker] has previously engaged in activities such as working as a tow truck driver and has reported being a caregiver for her parents (8F, p. 3; 9F; 12F, p. 5).

(Tr. 28.)

The ALJ also noted that "[t]he record does not show the claimant's mental impairments limited her to a greater extent than provided in the above residual functional capacity." *Id.* In addition, the ALJ gave partial weight to the findings by the State agency psychologist/psychiatrists (Dr. Mades, Tr. 26; Dr. DeVore, Tr. 30) that "claimant only had mild restriction in activities of daily living." (Tr. 26, 29-30.) The ALJ found that Dr. Mades' opinions were consistent with the record up to the point of her evaluation of Becker in February of 2011, but acknowledged that the subsequent records support "some moderate limitations." (Tr. 26.) The ALJ concluded that Becker "was more limited in social functioning and with regard to concentration, persistence, and pace than found by the State agency." (Tr. 30.) In doing so, although the ALJ characterized the weight he accorded Dr. Curry's opinion as "little," the ALJ did in fact consider her opinion. The ALJ stated that his RFC assessment "reflect[ed] the degree of limitation [he. . .] found in the 'paragraph B' mental function analysis" (Tr. 20), which he examined in detail in his written decision, *see* Tr. 19-20. He also noted that "[t]he record does not show [Becker]'s mental impairments limited her to a greater extent than provided in the above

[RFC]."   (Tr. 28.)

The ALJ further found that Becker is unable to perform any past relevant work (20 CFR 404.1565 and 416.965); she was born on September 2, 1969 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).   (Tr. 30.)   He also concluded that considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).   *Id.*

As to the manner in which the ALJ assessed the credibility of Becker's statements, the ALJ reviewed the *Polaski* factors and other considerations that are required under the law.   (Tr. 28-29.)   Overall, the ALJ found that Becker's "allegations were not wholly credible."   (Tr. 29.)   To support his conclusion, the ALJ examined:   Becker's statements regarding her activities of daily living; the fact that although she claimed a lack of health insurance negatively impacted her ability to seek medical treatment, her history of treatment was "historically sporadic and conservative"; emergency department records indicated drug-seeking behavior; Dr. Mades' discovery that Becker was an "[un]reliable informant" regarding her substance abuse in that she made inconsistent reports to two separate medical

providers regarding her prior substance abuse on the same day; and indication that Becker was involved in more work activity than she admitted to during the hearing as paper record included evidence she had been a tow truck driver and caregiver for her parents. *Id.*

Utlimately, the ALJ found:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Becker]'s statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

*Id.* The ALJ further noted that his RFC assessment was "supported by a longitudinal examination of the evidence." (Tr. 30.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on October 20, 2010, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

> Based on the application for supplemental security income filed on October 22, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 31.)

## IV.   Discussion

In this action for judicial review, Becker first claims that the ALJ's decision to

assign little weight to the opinion of her treating psychiatrist, Dr. Curry, was not supported by substantial evidence, or good reasons. Becker's second claim is that the ALJ failed to adequately explain his determination of her RFC. For the following reasons, the undersigned disagrees.

## IV.A.   The treating psychiatrist's opinion

At the time of the administrative hearing, Dr. Curry had been Becker's treating psychiatrist for a period of ten months between August 2011and May 2012; Becker visited with Dr. Curry a total of eleven times. During Becker's first visit with Dr. Curry in August 2011, Becker disclosed that she: was appealing the denial of her disability claim, completed high school and two associate degrees (culinary arts and computer skills), and had hopes to complete a Bachelor degree in Criminal Justice. (Tr. 541-42.) Dr. Curry diagnosed Becker with bipolar disorder and PTSD, and assessed a GAF score of either 48 or 50[2] for every visit. (Tr. 542, 545, 548, 551, 554, 557, 559, 561, 564, 567, 570.) Dr. Curry's treatment notes for all of Becker's visits reflected a "severe" Axis IV[3] impression regarding Becker's response to "chronic illness, marital, separation from child, and legal issues." *Id.*

---

2   A GAF score of 41-50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 34 (Text Revision 4th ed. 2000).

3   Axis IV is for reporting psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders (Axes I and II). *Id.* at 29. A psychosocial and environmental problem may be a negative life event, an environmental difficulty

The ALJ gave little weight to the GAF scores assigned by Dr. Curry. *Id.* at 27, 28. The ALJ remarked that

> Dr. Curry continued to assess [Becker] with GAF scores in the serious symptoms range, even when progress notes showed her symptoms improved. Additionally, Dr. Curry continued to indicate that [Becker]'s legal issues were considered (Exhibit 13F).

(Tr. 28.) The ALJ noted earlier in his decision that Dr. Curry's consideration of "[Becker]'s limitations included marital problems, separation from her child, and legal issues, which do not necessarily reflect [Becker]'s ability to work." (Tr. 27.) Becker did not complain about the ALJ's determination to give little weight to the low GAF scores assigned by Dr. Curry. The weight attributed by the ALJ to the low GAF scores was reasonable in light of the fact that Dr. Curry consistently rated Becker's psychosocial and environmental problems as severe even though Becker's symptoms and her life stressors improved. For example, even after Becker regained custody of her son prior to her March 14, 2012 session with Dr. Curry, Becker's elimination of this issue/stressor did not result in an improved GAF score. (Tr. 564, 567, 570.)

In her Medical Source Statement-Mental, Dr. Curry expressed the opinion that Becker had extreme, marked, and moderate limitations in her ability to perform

---

or deficiency, a familial or other interpersonal stress, an inadequacy of social support or personal resources, or other problem relating to the context in which a person's difficulties have developed. . . In practice, most psychosocial and environmental problems will be indicated on Axis IV. However, when a psychosocial or environmental problem is the primary focus of clinical attention, it should also be recorded on Axis I. . . *Id.*

sustained work. (Tr. 573-74) The ALJ accorded "little weight" to Dr. Curry's opinions, noting first that Dr. Curry's opinions were inconsistent with Becker's treatment records indicating improvement, activities of daily living, and recent history of working as a tow truck driver and being a caregiver for her parents.[4] (Tr. 28.) Furthermore, the ALJ reasoned that Becker engaged in many of these activities prior to resuming mental health treatment, and that as a result of her treatment "it would appear that her ability to perform work-related activities would increase. . .rather than decrease." *Id.*

One of the reasons the ALJ accorded Dr. Curry's opinions little weight was that they were incongruent with her own treatment notes, specifically finding that Becker's records indicate improvement. (Tr. 28) As an example, a review of Dr. Curry's treatment notes reveals that Becker's ability to concentrate was assessed as "moderately to severely impaired" between August 2011 and November of 2011, however, improved to only "moderately impaired" between December 16, 2011 and May 9, 2012. While Dr. Curry consistently noted psychiatric symptoms on

---

4  Becker alleges that she wasn't really a "caregiver" for her parents. (Doc. 14 at 10-11.) It is true that Becker did not list being a caregiver for her parents in any of the reports submitted to the SSA regarding her past work experience. Nevertheless, it was not improper for the ALJ to consider Becker's characterization of what she did for her parents outside of any proceeding related to her application for DIB and SSI benefits. During a visit to the Phelps County Regional Medical Center on March 11, 2012, according to the hospital treatment notes, Becker's chief complaint was "back pain" and she self-reported: "Five year history of sciatica. Patient is the care giver for her parents. She states sha has been lifting lots of laundry lately." (Tr. 521.)

examination, Becker was an active participant in the process of identifying which medications worked best to manage her symptoms.

Additional notations support that Becker's mental impairment improved with treatment, include Dr. Curry's notes for some visits that Becker's symptoms improved with medication. For example, in September 2011, Dr. Curry noted that Becker felt better after starting Trileptal. (Tr. 544.) The next month, Becker reported worsening depression, irritability, and difficulty completing tasks and the medications were adjusted. (Tr. 550-51.) As to Becker's involvement in assisting Dr. Curry in effectively modifying her prescriptions, the following is representative of her participation: in February, Becker reported that her medication was no longer effective, and she was experiencing symptoms of mania, including reduced ability to sleep, increased agitation, increased irritability, and aggressiveness (Tr. 558); two weeks later, Becker reported that her anxiety was on the rise (Tr. 560); in March, Dr. Curry indicated that Becker was less irritable, and her grooming had improved (Tr. 564); the next month, Becker reported that her medication was no longer effective, she was more apathetic, depressed, and she had decreased energy (Tr. 566); and in May 2012, the last visit in the record, Becker reported that her medications wore off as the day went on and she was more easily irritated, slept shorter periods, and her anxiety was on the rise (Tr. 569).

Becker's willing and effective communication with Dr. Curry regarding the

efficacy of the medications she was taking also supports that Becker does have the ability to understand and remember detailed instructions, as well as the ability to carry out detailed instructions, and the ability to respond appropriately to changes, although Dr. Curry's Medical Source Statement included the opinion that Becker was markedly limited in such areas. *See* Tr. 573. Based on Becker's feedback, Dr. Curry made adjustments to the medications that were prescribed and each time the medications were modified Dr. Curry noted that Becker "expressed understanding—her queries reflected good comprehension of planned intervention-and agreed to take medications as prescribed." (Tr. 543, 546, 548, 551, 554, 557, 559, 561, 564, 567, 570.)

While the symptomology of Becker's mental impairment required continued management, all of Dr. Curry's treatment notes included the conclusion that Becker's insight was either "fair to good," or "good," and that Becker had "good verbal fluency and comprehension coupled with full abstraction capacity indicative of above average intellectual function." (Tr. 542, 545, 548, 551, 554, 557, 559, 561, 564, 567, 570.) Dr. Curry's notes during two of Becker's last three visits included the following positive findings regarding Becker's progress:

> Gregarious. Grooming improved. Good eye contact. Psychomotor activity normal. Speech clear, with normal rate and volume—no push of speech. Content appropriate to query. Organization: run-on sentences, but not tangential nor with flight of ideas.

(Tr. 564, 567.)   During Becker's last visit, Dr. Curry noted that although Becker was irritated with a delay in the appointment time instead of being gregarious, Becker's grooming was "good" and her organization was "fully intact."   (Tr. 570.) In addition, for the last three treatment sessions, Dr. Curry indicated that Becker's affect was "moderately intense without lability," she was "less irritable," her attention was "fully intact," and memory was "grossly intact in all spheres."   (Tr. 564, 567, 570.)

Furthermore, Dr. Curry rated Becker's capacity to perform sustained work despite her mental impairments with regard to "Understanding and Memory," "Sustained Concentration and Persistence," "Social Interaction," and "Adapt-[ability]" as "markedly" to "extremely" limited in ten of the twenty rated categories; Dr. Curry assessed Becker's ability as "moderately limited" in ten categories.   (Tr. 573-74.)   Dr. Curry made these assessments more than three months after her last treatment session with Becker.   It is noteworthy that the limitations Dr. Curry assigned to Becker's functional abilities for sustained work were much more severe than any of Dr. Curry's assessments of Becker's overall level of functioning during treatment sessions, as none of Dr. Curry's treatment session notes described any of Becker's limitations as being marked or extreme.

The undersigned recognizes that "[a]lthough the mere existence of symptom-free periods may negate a finding of disability when a physical

impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996).   Additionally, "[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." *Id.*   Nevertheless, Becker "cites no authority suggesting that bipolar disorder's episodic nature is alone enough to reverse an ALJ's denial of benefits.   If that were the case, an ALJ could never deny benefits to a bipolar claimant—a result the law does not support." *Sneller v. Colvin*, 2014 WL 855618, *8 (N.D. Iowa 2014, No. C 12-4113-MWB).

The ALJ's decision to accord little weight to Dr. Curry's opinions was supported by substantial evidence in the record as a whole.

## IV.A.2.   The claimant's daily activities

The ALJ also indicated that Dr. Curry's opinions were inconsistent with Becker's daily activities.   (Tr. 28.)   The ALJ pointed out that Becker was the primary care-giver for her three-year-old child, provided some in-home care for a man named Paul Williams, and attended school online.   *Id.*   The ALJ further noted that Becker had previously worked as a tow truck driver, and as a caregiver for her parents.   *Id.*

First, with regard to Becker's care of her three-year-old child, Dr. Curry's treatment notes indicate that Becker's son was in foster care during a portion of the

time that she was receiving treatment from Dr. Curry.  (Tr. 541.)  As a result of Becker's ability to work with officials at the Division of Family Services (DFS), she was able to be reunited with her son and successfully regained custody.  (Tr. 563.) This accomplishment required Becker's persistence, an ability to communicate with authority figures, as well as the ability to follow directions.  It was proper for the ALJ to consider the fact Becker was the primary caregiver for her son.  In fact, the child attended the hearing before the ALJ with Becker.  (Tr. 40-41.)

With respect to Becker's other activities, Becker testified at the administrative hearing that she has taken online classes after her alleged onset of disability, but she dropped out because she had difficulty completing assignments.  (Tr. 43.)  Dr. Curry's treatment notes document Becker's difficulties performing school work. (Tr. 566.)  Those notes also reflect that Becker completed high school and earned two associate degrees.  (Tr. 541.)  Becker further testified that she tried working at an in-home healthcare position, 27.5 hours per week, from the middle of March to the end of April 2012, but she was terminated from the position.  (Tr. 45.)  Becker explained she left the job, because her employer simply said "this is just not going to work out."  *Id*.  Although Becker had recent failed attempts at completing college classes online and working part-time, the record does not support that those failures were caused by Becker's mental impairments.

On a final note, Becker's counsel mistakenly suggests that Becker's mental

impairment is what prevented Becker from returning to work. (Doc. 14 at 8.) There is nothing in the record to support that Becker left any of her jobs as a result of mental health issues since her alleged onset date of May 8, 2004, or any date thereafter. What the record does support is that Becker was let go from Walgreen's in 2006 based on her perceived involvement in an employee theft problem (Tr. 44-45); she left her job at CiCis' Pizza in 2007 after recovering from a shoulder injury to presumably work as a tow truck driver--Becker explained that her husband was the dispatcher and she drove the tow truck (Tr. 323, *see also* Tr. 542, Becker advised Dr. Curry that one of her prior jobs involved auto repossessions); and her work as a tow truck driver apparently ended around Thanksgiving of 2010, because the tow truck was inoperable (Tr. 444, 453, 455).

The undersigned finds that the bases upon which the ALJ determined to accord little weight to Dr. Curry's opinions are supported by substantial evidence on the record as a whole and constitute good reasons under the Regulations.

## IV.B.   Residual Functional Capacity

As previously noted, Becker also argues that the ALJ failed to provide a narrative discussion of the rationale for his mental RFC findings, and that the mental RFC determination is not supported by the medical evidence. The undersigned disagrees and further recognizes that Becker finds no fault in the ALJ's RFC assessment with regard to her physical limitations, rather only attacks the two

limitations that were applied to address her mental impairments.

The ALJ found that Becker was limited to only occasional interaction with coworkers, supervisors, and the public; and can understand, remember, and carry out simple instructions.   (Tr. 20.)   In determining Becker's mental RFC, the ALJ stated that he had considered and assigned partial weight to the findings by the State agency (Dr. Mades and Dr. DeVore) that "claimant only had mild restriction in activities of daily living."   (Tr. 26, 29-30.)   The ALJ found that Dr. Mades' opinions were consistent with the record up to the point of her evaluation in February of 2011, but acknowledged that the subsequent records support "some moderate limitations."   (Tr. 26.)   The ALJ concluded that Becker "was more limited in social functioning and with regard to concentration, persistence, and pace than found by the State agency."   (Tr. 30.)   In doing so, the "little weight" the ALJ accorded Dr. Curry's opinion was considered in making the RFC determination. Furthermore, the ALJ stated that his RFC assessment "reflect[ed] the degree of limitation [he. . .] found in the 'paragraph B' mental function analysis."   (Tr. 20.) The ALJ's paragraph B findings included that Becker had mild restriction in activities of daily living; moderate difficulties in social functioning and concentration, persistence, or pace; as well as no episodes of decompensation for an extended duration.   (Tr. 19-20.)

The ALJ also considered Becker's own statements, which he found were "not

wholly credible" for a myriad of reasons.   (Tr. 29.)   The reasons cited by the ALJ, included: the fact that the treatment of Becker's physical and mental impairments was "historically sporadic and conservative," evidence of "drug-seeking behavior" by Becker that made her an "unreliable informant," which further "weaken[ed] the credibility of [ Becker]'s statements regarding her symptoms and limitations"; and evidence that Becker failed to admit all of her prior work activity.[5]   (Tr. 29.)   The ALJ's conclusion regarding Becker's credibility is supported by substantial evidence in the record as a whole.

In consideration of the record as a whole the ALJ properly considered the medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.   As a result, the ALJ's RFC finding is supported by substantial evidence on the record as a whole.

## Conclusion

In sum, the decision of the ALJ finding Becker not disabled is supported by substantial evidence.   As a result, the ALJ's decision is AFFIRMED.

s/Abbie Crites-Leoni
ABBIE CRITES-LEONI
Dated this 31st day of March, 2015.        UNITED STATES MAGISTRATE JUDGE

---

5   In this regard, Becker was not forthright regarding her prior work history when she submitted information to the SSA for consideration of her disability claim.   For example, when reporting her work history on at least three separate forms that were completed on October 22 and 26, 2010, as well as March 7, 2011 she failed to disclose her work history at Walgreen's between 2004 and 2006, CiCi's Pizza in 2007 (Tr. 196, 235), or her work as a tow truck driver between 2007 and 2010 for her husband's business (Tr. 268).